# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* | )<br>)<br>)<br>)<br>)<br>)    Case No. |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

**<u>ATTACHMENT A-1</u>**

<u>PREMISES TO BE SEARCHED</u>

1.    The premises located at 29782 Painted Desert Drive,
in the city of Menifee, California (the "SUBJECT RESIDENCE").
The SUBJECT RESIDENCE is a two-story single family home, lowith
a tan roof, white trim and gray stucco.  The front door faces
west and is located on the north side of the residence.  The
numbers 29782 are written in approximately 6-inch black numbers
on the north west corner.  There are two sets of garages on the
west side of the residence.  The SUBJECT RESIDENCE to be
searched includes (a) all rooms, porches, containers, and safes
in the SUBJECT RESIDENCE; (b) the driveway, and any garages,
carports, storage spaces, or other outbuildings on the SUBJECT
RESIDENCE; (c) any digital devices found at the SUBJECT
RESIDENCE; (d) any vehicle parked in the garage, driveway, or
carport of the SUBJECT RESIDENCE.

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are the fruits,
instrumentalities, and evidence of 18 U.S.C. §§ 371, 2320
(Conspiracy to Traffic in Counterfeit Goods), 18 U.S.C. § 924(c)
(Possession, Use, Brandishing, and/or Discharging of a Firearm
in Furtherance of a Drug Trafficking Crime or Crime of
Violence), and 21 U.S.C. § 841(a)(1) (Possession with Intent to
Distribute a Controlled Substance) namely:

a.    Any document or records relating to any bank
accounts, credit card accounts, or other financial accounts;

b.    Records, documents, programs, applications,
photographs, screenshots, images, or materials relating to
conversations relating to the distribution of drugs, including
ledgers, pay/owe records, distribution or customer lists,
correspondence, receipts, records, and documents noting price,
quantities, and/or times when drugs or firearms were bought,
sold, used, or otherwise distributed;

c.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

d.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written

1

communications sent to or received from any of the digital
devices and which relate to the above-named violations;

   e. Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations or related to any
communications with C.P.;

   f. Audio recordings, pictures, video recordings, or
still captured images relating to the use, possession or
distribution drugs or firearms and the collection or transfer of
the proceeds of the above-described offenses;

   g. Contents of any calendar or date book;

   h. Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

   i. Any digital device used to facilitate the above-
listed violations (and forensic copies thereof).

   j. With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

     i. evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,

2

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

4

seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other

5

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, with respect to CHRISTOPHERSON, and IBARRA, and any person who is located at the SUBJECT RESIDENCE during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is a SUBJECT DEVICE or located at the SUBJECT RESIDENCE and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Nicholas A. DeSimone, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against, and arrest warrant for, SCOTT CHRISTOPHERSON ("CHRISTOPHERSON") and ALEJANDRO IBARRA ("IBARRA"), for Conspiracy to Traffic in Counterfeit Goods in violation of 18 U.S.C. §§ 371, 2320(a).

2. This affidavit is also made in support of an application for a search warrant to search the following:

a. The single family residence located at 29782 Painted Desert Drive, Menifee, California 92584 ("SUBJECT RESIDENCE"), as further described in Attachment A-1;

b. A Huawei Nexus cell phone Model Number H1511, Serial Number: 8487N16125001960, IMEI Number: 867686022321788 seized during the arrest of CHRISTOPHERSON ("SUBJECT DEVICE 1"), as further described in Attachment A-2;

c. A Lorex 4k Network Digital Video Recorder, Model Serial Number ND031710018905, ("SUBJECT DEVICE 2"), and a SanDisk Cruzer Thumb Drive, Serial Number SDCZ36-008G, ("SUBJECT DEVICE 3"), and a silver Acer Aspire V5, Serial Number NXM49AA0333140DA1F6600 with a Gemalto Authentication Dongle, ("SUBJECT DEVICE 4," collectively with SUBJECT DEVICE 1, SUBJECT DEVICE 2, and SUBJECT DEVICE 3, the "SUBJECT DEVICES") seized by Homeland Security Investigations ("HSI") from 41110 Sandalwood Circle #114, Murrieta, California, on March 4, 2018, and

1

currently maintained in the custody of HSI as described more fully in Attachment A-3.

3.    As further described in Attachment B, the requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 2320 (Conspiracy to Traffic in Counterfeit Goods), 18 U.S.C. § 924(c) (Possession, Use, Brandishing, and/or Discharging of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence), and 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute a Controlled or Counterfeit Substance) (the "Subject Offenses").  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, as well as my conversations and analysis with more experienced agents and officers who are familiar with drug trafficking.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT NICHOLAS DESIMONE

5.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, HSI.  I have been employed as an SA with HSI since

2

February 2016.  I am currently assigned to the Office of the Assistant Special Agent in Charge, Los Angeles International Airport ("LAX").  I attended about 20 weeks of the Criminal Investigator Training Program and HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia where I received specialized training concerning violations of the Controlled Substances Act contained within Title 21, among other violations of the United States Code, and criminal conspiracies involving the smuggling and distribution of dangerous drugs.  Based on my training and experience, I am familiar with drug distributors' methods of operation including the receipt, distribution, storage, and manufacture of controlled substances and counterfeit controlled substances.

6.    I have been the case agent and assisting case agent for multiple investigations involving drug distribution in the Southern California area.  These investigations have focused on drug distribution, firearms violations, and conspiracies associated with drug offenses.  I am familiar with how digital devices are used to facilitate and conceal these crimes.  I have interviewed defendants, informants, and witnesses who have personal knowledge regarding drug trafficking organizations.  I have executed numerous search warrants to seize evidence of violations of federal and state law, as well as arrest warrants to apprehend individuals who have committed such violations.  Additionally, I have led and participated in numerous investigations and operations to detect and combat the

importation, trafficking, distribution, and sales of fentanyl and fentanyl-related substances.

7.    Before my employment with HSI, I was a Border Patrol Agent with the United States Border Patrol, from March 2009 to 2016.  In 2009, I attended and completed the United States Border Patrol Academy in Artesia, New Mexico, which lasted about 20 weeks.

8.    Throughout my career as a federal agent, I have received numerous hours of training in drug investigations, investigative techniques, surveillance, and evidence collection.

9.    I am currently a member of the HSI-led Los Angeles Opioid Task Force ("OTF"), which is based at the LAX International Mail Facility ("IMF") in Torrance, California.  I have investigated the deaths of individuals as their deaths relate to controlled substances trafficking activities and I am familiar with the dangerous effects of fentanyl, fentanyl-related substances, and other synthetic opioids.  These investigations and operations have resulted in the dismantlement of clandestine drug laboratories, and numerous seizures of fentanyl, fentanyl-related substances, and other dangerous synthetic opioids, controlled substances, and contraband.

### III.  SUMMARY OF PROBABLE CAUSE

10.    In December 2017, HSI SAs and United States Postal Inspection Service ("USPIS") inspectors intercepted two parcels and found in these parcels Clonazolam, a benzodiazepine.  I know that benzodiazepine substances can be mixed with fentanyl, a controlled substance, for distribution.

11.  Law enforcement interviewed the two intended recipients of the parcels.  The intended recipients both told law enforcement that they were receiving packages on behalf of "Scott."  The second package recipient, C.P., told law enforcement that C.P. received packages for SCOTT CHRISTOPHERSON.  CHRISTOPHERSON also told C.P. that he made and sold pills.[1]

12.  On or about March 3, 2018, at C.P.'s residence, both C.P.'s mother's car and C.P.'s residence were shot, a nearby trashcan was tagged with CHRISTOPHERSON and IBARRA's monikers, and C.P. reported that somebody who sounded like CHRISTOPHERSON threatened C.P. over the phone.

13.  On or about March 4, 2018, OPD obtained a state search warrant for CHRISTOPHERSON and IBARRA's shared residence, 29782 Painted Desert Drive, Menifee, California 92584 (the "SUBJECT RESIDENCE"), which resulted in the discovery of approximately 500 pills stamped with "Xanax" markings.

14.  In a post-arrest interview with OPD detectives, IBARRA told law enforcement about IBARRA and CHRISTOPHERSON's involvement with the shooting of C.P.'s residence and with manufacturing pills.

15.  Investigators obtained a state search warrant and searched the location of IBARRA and CHRISTOPHERSON's pill-pressing operation, which resulted in the discovery of SUBJECT

---

[1] C.P. became a confidential source of information for law enforcement as they continued their investigation of CHRISTOPHERSON.  C.P. is cooperating to reduce C.P.'s sentencing exposure for C.P.'s role in this drug scheme.

DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4, a large
commercial-grade chemical mixer, a pill press, a shipping
receipt listing CHRISTOPHERSON's name and the SUBJECT
RESIDENCE's address, unknown powders, and approximately several
hundred to several thousand pills.  When CHRISTOPHERSON was
arrested, he was found with a key on his key chain that could
open the pill-press laboratory locks.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my personal involvement, conversations with,
and information obtained by Customs and Border Patrol ("CBP")
officers and other HSI SAs, I know the following:

**A.   First Seizure of Clonazolam**

17.  On or about December 11, 2017, law enforcement
discovered a suspicious international parcel sent from China
bearing tracking number EV876738858CN addressed to J.G. at PO
Box 7402, Orange, California (the "J.G. PARCEL").  The J.G.
PARCEL came to my attention after it was referred to me by CBP
Officer Patrick Burt.  The package continued in the mail stream
to the Post Office in Orange, California.

18.  Officer Burt is a full-time member of CBP-Chicago's
Tactical Analytical Unit.  Officer Burt's job is to analyze
manifest data, seizure data, and other information that can help
him identify commodities being smuggled into the United States,
contrary to law.  CBPO Burt has, on numerous occasions, provided
me with advanced information on controlled substances,
specifically opioids, that has resulted in criminal

6

investigations, drug seizures, arrests, and the dismantlement of clandestine pill-pressing locations and drug labs.

19.   Officer Burt, in this occasion, told me that analyzed data for the shipping manifest, as well as the shipper's history.  The Chinese shipper, Zhouxiang, had several shipments delivered to the United States in the several days prior to this referral which had resulted in CBP intercepting them and seizing contraband.

20.   Officer Burt opined that it was probable that this shipment might have controlled substances or otherwise illicit contraband in it.  I am not aware of and do not recall any instances of Officer Burt providing me with incorrect opinions or referrals on probable shipments of contraband.

21.   On or about December 15, 2017, law enforcement intercepted the package before it was received by J.C. but after it arrived at the Post Office in Orange, California.

22.   There, CBP conducted a border search examination of the package and discovered it contained approximately 446.5 grams of a yellow, powdery substance.  Using a substance field test, the substance was presumptively identified as Clonazolam, a benzodiazepine similar to Alprazolam.

23.   On or about December 18, 2017, USPIS Inspector Joseph Weidenkopf wrote his phone number[2] on a USPS Form 3849, Delivery

---

[2] Inspector Weidenkopf did not indicate he was law enforcement and left the number merely as an employee of USPS. Postal inspectors regularly act in an undercover capacity like this in furtherance of criminal investigations.

Notice/Reminder/Receipt, and left it in PO Box 7402.  Inspector Weidenkopf did not leave the package in the PO Box.

24.  On or about December 22, 2017, Inspector Weidenkopf received a telephone call from J.G.  Over the course of several phone calls, Inspector Weidenkopf, acting in an undercover capacity as a regular United States Postal Service ("USPS") employee, made arrangements to have J.G. pick up the J.G. PARCEL at the Orange Post Office on December 28, 2017.

**B.    J.G. Interview**

25.  Law enforcement conducted a database check and learned that J.G. was driving on a suspended license.  On or about December 28, 2017 law enforcement saw J.G. arrive at the Orange Post Office and asked to speak to J.G.  Law enforcement took J.G. aside, read J.G. his <u>Miranda</u> rights, which he waived, and interviewed J.G.  During that interview, J.G. said the following in summary:

a.    J.G. was picking up the J.G. PARCEL for a friend, C.P., who was hired by a man J.G. only knew as "Scott" to open PO boxes and receive packages on Scott's behalf.  C.P. would pay J.G. $100 for each package he received on C.P. and Scott's behalf.

b.    J.G. had previously received one package via the mail for Scott.

c.    J.G. did not know what was in the packages, but assumed it was something illegal.

       d.   J.G. retrieved the packages from the PO box, then delivered them to C.P. at C.P.'s house.  C.P. would then deliver them to Scott at a location in Temecula, California.

**C.  C.P. Interview**

26.  On or about January 2, 2018, law enforcement called C.P. and requested that C.P. speak to law enforcement about an unrelated restraining order investigation where she was listed as a witness.  C.P. came to the OPD station and was interviewed by Detective Taketa about the restraining order investigation.

27.  After speaking with C.P. about the restraining order investigation, Detective Taketa asked C.P. if he could speak to C.P. about another investigation.  Detective Taketa explained that C.P. was free to leave, and was not under arrest.  C.P. agreed to speak to Detective Taketa.

28.  During this interview of C.P., Detective Taketa learned the following in summary:

       a.   After initially denying that s/he received packages from China, C.P. admitted s/he was paid by CHRISTOPHERSON whom C.P. had met in October 2017, to open a PO box and receive packages on his behalf for $100 each package.

       b.   C.P. opened PO Box 2671, Orange, California 92859 (the "C.P. PO Box") for the purpose of receiving parcels on CHRISTOPHERSON's behalf.

       c.   C.P. received two parcels on CHRISTOPHERSON's behalf.  One of which, C.P. delivered to CHRISTOPHERSON's then-residence in Santa Ana, California.  CHRISTOPHERSON picked up the other parcel from C.P.'s residence.

      d.    CHRISTOPHERSON told C.P. that he was making counterfeit Xanax by "pressing pills."

      e.    C.P. thought that CHRISTOPHERSON also sold drugs.

      f.    C.P. agreed to notify Detective Taketa when CHRISTOPHERSON would have parcels sent to C.P.'s PO box.

**D.   Second Seizure of Clonazolam**

29.  On or about January 8, 2018, Inspector Weidenkopf discovered that the C.P. PO Box contained a package (the "C.P. PARCEL") addressed from China. Detective Taketa spoke with C.P., who was unaware of the parcel, but provided consent for law enforcement to take the package.

30.  On or about January 9, 2017, I met Inspector Weidenkopf and Detective Taketa at the OPD station and examined the unopened C.P. PARCEL. The package was addressed from the same sender and address as the J.G. PARCEL, and had arrived in the United States from China several days earlier.

31.  Inspector Weidenkopf informed me that the C.P. PARCEL had been in government possession since entering the United States. Based on my knowledge of the previous seizure of Clonazolam from the same sender, my knowledge of CHRISTOPHERSON's drug importation network, and C.P.'s statements, I had reasonable suspicion to believe the C.P. PARCEL contained drugs.

32.  I performed a border search of the C.P. PARCEL and discovered a yellow, powdery substance, similar to the substance

from the J.G. PARCEL.  Using a substance field test, the
substance was presumptively identified as Clonazolam.[3]

**E. Packages Sent to C.P.'s Residence**

33.  On or about January 22, 2018, C.P. contacted Detective
Taketa and told him that C.P. received three boxes, at C.P.'s
residence, all via FedEx, that C.P. did not order.  C.P. brought
the packages to the OPD station.  The packages were addressed to
C.P., but referenced "VitaCo" on line two of the mailing
address.  C.P. brought the packages to the OPD station and gave
officers consent to open the packages.

34.  Law enforcement opened the packages and tested the
powder inside.  Law enforcement presumptively identified the
powder as lactose.  Based on my training and experience, I know
that lactose is a "cutting agent" to dilute powdered drugs.

35.  I queried DHS's import/export indices and found that
another address shipment for "VitaCo" listed the "Ultimate
Consignee" as "Scott Chritophersen."  That parcel was shipped to
the United States from Canada in August 2017, and was described
as containing "Inert Excipients."[4]

**F. Shooting at C.P.'s Home and CHRISTOPHERSON's Threats
to C.P.**

36.  At approximately 12:10 a.m. on or about March 3, 2018,
OPD dispatch received several reports of gunshots in Orange.
Law enforcement later learned that the gunshots occurred at

_____

[3] Additionally, on or about January 15, 2018, C.P. received
a package from China that law enforcement opened.  The substance
inside tested negative for a controlled substance.

[4] Based on my training and experience, excipients are inert
substances that can be used as diluents for drugs.

C.P.'s address.  OPD officers arrived and discovered a vehicle that was shot twice and a residence later identified as C.P.'s house was shot once.  Law enforcement discovered that C.P.'s mother was in the residence at the time of the shooting, and that a bullet went through a wall and lodged in the refrigerator.

37.  Responding officers identified freshly-spray painted graffiti with the names "Ghost" and "Conker" on the trashcans of the residence.

38.  OPD Officer Shryrock canvassed the area and located surveillance footage from a nearby residence.  In the footage, Officer Shryrock observed what he believed to be the vehicle involved in the shooting, an older-model brown sport-utility vehicle.  No license plate or individuals are clearly visible from the footage that Officer Shryock viewed.

39.  OPD Corporal Bueno canvassed the area and spoke with a witness, Gustavo Zavala, who said that he heard three or four gunshots, then saw an older brown Chevrolet Suburban speeding away from the area.

40.  At approximately 11:15 a.m. on March 3, 2018, law enforcement met with C.P.  During an interview of C.P., Detective Alfaro learned the following in summary:

a.  At approximately 12:12 a.m. that morning, while out with friends, C.P. received two missed phone calls from telephone numbers (714) 643-5134 and (714) 234-7902 (the "7902 Number").  C.P. was unfamiliar with the phone numbers and did not answer the calls.

b.    At approximately 12:32 a.m., C.P. received a call from C.P.'s grandmother, who told C.P. that people shot at C.P.'s house that night.  C.P. drove home and found police at C.P.'s house.

c.    While there, C.P. saw the graffiti of the name "Ghost" on a trash can.  C.P. immediately suspected that CHRISTOPHERSON was involved, because s/he knew that CHRISTOPHERSON sometimes went by the moniker of "Ghost."

d.    At approximately 2:40 a.m., while getting food at a nearby taco shop, C.P. called the 7902 Number and heard a man answer.  C.P. recognized CHRISTOPHERSON's voice and told him, "I know you did it."  The man replied, "I know you're talking to the cops.  Keep it up and I'm going to kill you," then the man hung up.

e.    C.P. feared for C.P.'s life and believed CHRISTOPHERSON would carry out his threat.

41.  Detective Alfaro spoke with OPD Gang Unit Sergeant McCafferty, who advised Detective Alfaro that the second moniker, "Conker," was an alias for IBARRA, who was known to OPD.  When OPD detectives viewed IBARRA's Facebook profile, they saw it contained the moniker.  Additional queries of OPD's records showed that in a prior police contact, IBARRA had been identified as the similarly spelled "Konkr" and had provided the 7902 Number as his phone number to OPD officers during booking for a prior arrest in November 2017.

13

G.   **Search of the SUBJECT RESIDENCE**

42.   OPD detectives learned that the water and electric utilities at the SUBJECT RESIDENCE are in CHRISTOPHERSON's name.

43.   On or about March 3, 2018, OPD detectives initiated surveillance of the SUBJECT RESIDENCE to further investigate the shooting of C.P.'s residence.  When the detectives arrived at the SUBJECT RESIDENCE, they noticed a brown Chevrolet Suburban that matched the description of the suspect vehicle from the shooting of C.P.'s house.

44.   Shortly after initiating surveillance, at approximately 8:00 p.m., Detective Taketa saw CHRISTOPHERSON driving the brown Chevrolet Suburban away from the SUBJECT RESIDENCE.  Detective Taketa knew what CHRISTOPHERSON looked like based on pictures he had seen of CHRISTOPHERSON through the investigation.  Law enforcement saw CHRISTOPHERSON driving 65 miles per hour in a 50 mile per hour zone.

45.   OPD officers followed the Suburban and initiated a traffic stop.  CHRISTOPHERSON was then detained.

46.   OPD detectives obtained a state search warrant for the SUBJECT RESIDENCE.  The state search warrant permitted law enforcement to search for evidence of the shooting at C.P.'s house and allowed for night service.

47.   At approximately 2:00 a.m. on March 4, 2018, OPD personnel executed the state search warrant at the SUBJECT RESIDENCE.  During the search of the residence, law enforcement discovered that IBARRA leaved at the SUBJECT RESIDENCE, found IBARRA in the house, and found approximately 500 pills stamped

14

with "Xanax" markings in the room that IBARRA said was his
bedroom.

48.   OPD detectives placed IBARRA under arrest for state
charges related to the possession of Xanax for sale.  IBARRA was
notified of his <u>Miranda</u> rights, which he waived.  During an
interview with IBARRA, Detective Taketa learned the following,
in summary:

a.   IBARRA, CHRISTOPHERSON, and another man were
present for the shooting of C.P.'s residence;

b.   Before the shooting, CHRISTOPHERSON showed IBARRA
a handgun and told him they were driving to a woman's house to
intimidate her because she was providing police information
about CHRISTOPHERSON's involvement in drug sales.

c.   When they arrived at the residence,
CHRISTOPHERSON and the other man got out of the car, but IBARRA
did not.  Shortly thereafter, IBARRA heard gunshots.  IBARRA did
not see CHRISTOPHERSON shoot into the house, but IBARRA said he
thought that CHRISTOPHERSON was the shooter.

d.   After the shooting, IBARRA, CHRISTOPHERSON, and
the third man, got into the car and fled the scene.  At some
point after the shooting, they stopped to buy cocaine and
methamphetamine and then drove to CHRISTOPHERSON's warehouse at
41110 Sandalwood Circle, Suite 114, Murrieta, California 92562
(the "Murrieta location").

e.   IBARRA believed the gun used to perpetrate the
shooting was at the Murrieta location, as that was where IBARRA
knew that CHRISTOPHERSON kept his guns.

15

f.    IBARRA, who described himself as CHRISTOPHERSON's worker, told Detective Taketa that CHRISTOPHERSON maintained the Murrieta location as a shirt warehouse, and that it housed his pill-pressing operation.  IBARRA said he worked there pressing pills.

g.    CHRISTOPHERSON told IBARRA what chemicals and substances to use in the pill mixture, however, IBARRA claimed to not know what, specifically, was in the pills.  IBARRA claimed it was a stronger version of Xanax.

h.    IBARRA thought that CHRISTOPHERSON's pill-pressing operation at the Murrieta location produces approximately 100,000 pills every two days.

i.    IBARRA was unable to recall the exact address of the pill-pressing operation, but described it as being on Sandalwood Circle in Murrieta, California, with a business name of "SCSA."

49.    Following the search warrant of the SUBJECT RESIDENCE, CHRISTOPHERSON was placed under arrest.  At the time of his arrest, CHRISTOPHERSON was in possession of SUBJECT DEVICE 1.

**H.    Search of the Murrieta Location**

50.    OPD detectives drove to the Murrieta location and found business "SCSA."  Detective Taketa obtained a state search warrant for the Murrieta location to search for evidence of distribution of controlled substances and evidence of the shooting of C.P.'s house.

51.    At approximately 8:45 p.m. on or about March 4, 2018, law enforcement executed the state search warrant at the

16

Murrieta location.  A physical search resulted in the discovery
of a large, commercial-grade chemical mixer, a pill press,
SUBJECT DEVICE 2, SUBJECT DEVICE 3, SUBJECT DEVICE 4, unknown
powders, and approximately several hundred thousand pills.  The
gross weight of the pills, which I believe were all stamped with
"Xanax" markings, was approximately 2.6 kilograms.

54.    SUBJECT DEVICE 3 appears to be part of security system
that appeared to be connected to internal surveillance cameras.

53.    A shipping receipt containing CHRISTOPHERSON's name
and the SUBJECT RESIDENCE's address was found at the Murrieta
location.  Law enforcement also tested the keys that were
discovered on CHRISTOPHERSON's person and discovered that one of
the keys could open the locks at the Murrieta location.

## V.    TRAINING AND EXPERIENCE REGARDING BORDER PROTECTION SCREENING PROCEDURES AND PROTOCOLS

54.    Based on my experience and training and familiarity
with investigations into border protection screening procedures
conducted by other law enforcement agents, I know the following:

55.    CBP must examine and admit international mail parcels
and shipments that arrive in the United States before they are
delivered to their destinations by a carrier, including the
USPS.  CBP officers are assigned to IMFs, like the LAX IMF in
Torrance, California.  CBP officers conduct routine examinations
of foreign mail service parcels at the LAX IMF as they enter the

United States before the parcels are prepared for delivery to their final destination.[5]

56.   Pursuant to their authority under Title 19, Code of Federal Regulations, Section 162.6 (also known as "Border Search Authority"), CBP officers and HSI SAs may conduct examinations of goods entering the United States without a search warrant, probable cause, or individualized suspicion.

57.   "Extended border searches" are permissible under the Border Search Authority and allow government officials to perform warrantless search if the following three requirements are satisfied: (a) the government is reasonably certain the person or commodity has crossed the border or that a "high degree of probability" exists that the border was crossed; (b) the government is reasonably certain that no material change in the person or object has occurred between the time of the border crossing and the time of the search; and (c) government has reasonable suspicion of criminal activity.

## VI. TRAINING AND EXPERIENCE RELATED TO TRAFFICKING IN XANAX, FENTANYL, FENTANYL ANALOGUES, AND FENTANYL-RELATED SUBSTANCES

58.   Based on my training, experience, and participation in drug trafficking investigations, my conversations and experience with other HSI SAs, CBP officers, chemists, pharmacologists, medical professionals, and other law enforcement officers, and

---

[5] Due to the large volume of cargo that enters the U.S. on a daily basis, CBP is unable to individually examine all parcels. CBP uses a variety of methods to select parcels for border search examination, including random and targeted inspections.

my knowledge and familiarity  with this investigation, I know
the following:

59.   Xanax is a Benzodiazepine and is a controlled
substance that can be abused by drug users.  Drug traffickers
often mix substances such as Fentanyl and other Benzodiazepines,
such as Clonazolam, to create counterfeit Xanax in order to
simulate the effect of Xanax.

60.   Fentanyl is a dangerous, synthetic opioid that is
approximately fifty to one-hundred times more potent than heroin
and morphine.  Fentanyl is lethal in doses as small as
approximately two milligrams.  Analogues of fentanyl have been
known to be approximately ten-thousand times more potent than
heroin and morphine.  A lethal dose of fentanyl can be
accidentally absorbed through the skin.  Fentanyl poses a danger
to not only its users, but also to law enforcement, customs
officials, medical professionals, first responders, and postal
workers and cargo carriers who unknowingly may come into contact
with the substance in its various forms while transiting through
the mail system.

61.   In addition to synthesis laboratories, many drug
trafficking organizations use "pill press" laboratories, where
they take fentanyl, fentanyl-related substances, and other
drugs, and manufacture illicit pills for distribution and sales.
These pill-pressing locations are frequently discovered in the
domestic United States.

62.   Due to the illicit nature of fentanyl its analogues,
and other controlled substances, Chinese and American

distributors and consignees conspire to conceal the existence of the drugs, drug precursors, and associated materials or manufacturing paraphernalia when they are shipped to the United States. In order to conceal the nature of shipments, shippers often falsify documentation for shipments, including import/export manifests.

## VII. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

63. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

64. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs. These records are often maintained where the drug trafficker has ready access to them, such as at their residence, or on their cell phones and other digital devices.

65. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each

other and others to boast about the drugs or facilitate drug sales.

66. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

67. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

68. Based on my training and experience, drug traffickers may, in furtherance of drug trafficking, intimidate cooperators and potential witnesses in order to protect the drug trafficking organization. They will use digital devices to coordinate the intimidation by texting, calling, or sending photographs of locations and weapons to intimidate potential witnesses.

69. Drug traffickers often have supplemental security systems that record the surroundings in order to protect the drugs. Such security systems are also likely to contain evidence of the drug trafficker's own activities at the warehouse and the presence of any co-conspirators.

21

## VIII.        TRAINING AND EXPERIENCE ON DIGITAL DEVICES

70.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical

22

manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[6] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular

---

[6] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

       e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and

the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt"

26

to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

71.  As discussed herein, based on my training and
experience I believe that digital devices will be found during
the search of the SUBJECT RESIDENCE.  Additionally, I have
already seized the SUBJECT DEVICES.  I believe that some of the
SUBJECT DEVICES, including the Huawei Nexus cell phone already
seized, and the digital devices we may seize at the SUBJECT
RESIDENCE, may have a feature that enables their users to unlock
their devices through the biometric features of the user.

27

a.    I know from my training and experience and my
review of publicly available materials that several hardware and
software manufacturers offer their users the ability to unlock
their devices through biometric features in lieu of a numeric or
alphanumeric passcode or password.  These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

b.    If a device is equipped with a fingerprint
scanner, a user may enable the ability to unlock the device
through his or her fingerprints.  For example, Apple Inc.
("Apple") offers a feature on some of its phones and laptops
called "Touch ID," which allows a user to register up to five
fingerprints that can unlock a device.  Once a fingerprint is
registered, a user can unlock the device by pressing the
relevant finger to the device's Touch ID sensor, which on a cell
phone is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the
phone, and on a laptop is located on the right side of the
"Touch Bar" located directly above the keyboard.  Fingerprint-
recognition features are increasingly common on modern digital
devices.  For example, for Apple products, all iPhone 5S to
iPhone 8 models, as well as iPads (5th generation or later),
iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.

Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

        d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that
are unique and stable.  Iris-recognition technology uses
mathematical pattern-recognition techniques to map the iris
using infrared light.  Similarly, retina scanning casts infrared
light into a person's eye to map the unique variations of a
person's retinal blood vessels.  A user can register one or both
eyes to be used to unlock a device with these features.  To
activate the feature, the user holds the device in front of his
or her face while the device directs an infrared light toward
the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

    72.  In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode

or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

73.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.   I do not know the passcodes of the devices likely to be found during the search.

31

74.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require CHRISTOPHERSON, IBARRA, and any individual who is found at the SUBJECT RESIDENCE and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

75.    For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to CHRISTOPHERSON, IBARRA, and every person who is located at the SUBJECT RESIDENCE during the execution of the search and who is reasonably believed by law enforcement to be a

32

user of a biometric sensor-enabled device that is a SUBJECT DEVICE or is (a) located at the SUBJECT RESIDENCE and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

76.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

77.  For all the reasons described above, there is probable cause to believe that CHRISTOPHERSON and IBARRA has committed a violation of 18 U.S.C. §§ 371, 2320 (Conspiracy to Traffic in Counterfeit Goods).  Also, for all the reasons described above, there is probable cause to believe that the items described in Attachment B are evidence,

///

///

///

33

fruits, and instrumentalities of the offenses described in

Attachment B, and will be found in the digital device described

in Attachment A-1, A-2, A-3.


_____

Nicholas A. DeSimone
Special Agent
Homeland Security
Investigations


Subscribed to and sworn before me
This ____ day of March 2018.


_____
HONORABLE ALEXANDER F. MACKINNON
UNITED STATES MAGISTRATE JUDGE